Filed 6/9/14  P. v. Maddox CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B234514 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA344164) |
| v. | |
| KEVIN MADDOX et al., | |
| Defendants and Appellants. | |

APPEAL from judgments of the Superior Court of Los Angeles County.  Patricia M. Schnegg and Alex Ricciardulli, Judges.  Affirmed in part and reversed in part.

Patricia J. Ulibarri, under appointment by the Court of Appeal, for Defendant and Appellant Kevin Maddox.

Christine C. Shaver, under appointment by the Court of Appeal, for Defendant and Appellant Morgan Smith.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Marc. A. Kohm and Steven E. Mercer, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Kevin Maddox and Morgan Smith (collectively defendants) appeal from judgments entered after a jury found each of them guilty of willful, deliberate and premeditated attempted murder, assault with a firearm, unlawfully carrying a loaded firearm, conspiracy to transport and sell cocaine, and two counts of conspiracy to commit murder. The jury also found gang and firearm enhancement allegations against defendants to be true. After defendants admitted prior conviction allegations, the trial court sentenced Maddox to 114 years to life plus 69 years, and sentenced Smith to 130 years to life plus 69 years. Maddox and Smith each join in the contentions the other raises on appeal.

Maddox contends the trial court committed reversible error in denying his *Wheeler*/*Batson* motion.[1] He also contends, in related arguments, (1) there is insufficient evidence establishing the existence of three separate conspiracies as charged in the information and found by the jury, (2) the trial court committed reversible error in not instructing the jury sua sponte to decide whether there was "a single, all-inclusive conspiracy," or multiple conspiracies, and (3) Penal Code section 654[2] prohibits multiple punishments for the three conspiracy counts.

Smith contends there is insufficient evidence supporting the convictions for attempted murder and assault with a firearm. He also contends section 654 prohibits multiple punishments for the attempted murder count and the first of the two conspiracy to commit murder counts. Finally, he contends the trial court erred in imposing the prior serious felony enhancements under section 667, subdivision (a)(1), because the enhancements were not properly pleaded or proved.

We agree with Smith that the prior serious felony enhancements were not properly imposed. Accordingly, we reverse those enhancements. In all other respects, we affirm.

---

[1] *Batson v. Kentucky* (1986) 476 U.S. 79; *People v. Wheeler* (1978) 22 Cal.3d 258.

[2] Statutory references are to the Penal Code unless otherwise indicated.

## BACKGROUND

### Defendants' Gang Membership

At all times relevant to this appeal, Maddox and Smith were members of the Hoover criminal street gang. They belonged to the 7-4 Hoover set. Maddox was a leader of the gang, having been a member for 15 to 20 years. Smith was a "soldier" in the gang. According to the prosecution's gang expert, Los Angeles Police Department (LAPD) Officer Nicholas Hartman, a "soldier" in a gang is "someone who goes out and commits these crimes and rallies the troops to commit the crimes with him." At trial, Officer Hartman opined Maddox and Smith committed the charged offenses for the benefit of and in association with the Hoover criminal street gang. The jury agreed, finding the gang enhancement allegation to be true as to each charged offense. Neither defendant challenges the gang enhancement findings on appeal.

### Investigation

Evidence presented at trial indicated defendants came to the attention of law enforcement during an investigation of a March 1, 2004 armored car robbery and homicide, not related to the offenses charged in this case. A joint task force formed between the robbery/homicide division of the LAPD and the Federal Bureau of Alcohol, Tobacco, Firearms and Explosives investigated those 2004 crimes. As Officer Hartman testified at trial, after gathering information indicating Maddox might have been involved in two murders and trafficking narcotics, the Los Angeles County District Attorney's Office applied to the superior court for several wiretaps to monitor defendants' telephone calls. The LAPD monitored more than 10,000 calls pursuant to these court-ordered wiretaps.[3] The prosecutor played 66 calls for the jury. The calls were made between June 7 and July 16, 2008. Transcripts of these calls are included in the record on appeal.

---

[3] As discussed below, Maddox has asked this court to independently review the public and sealed portions of the wiretap documents and proceedings and decide whether the trial court erred in denying his motion to unseal the wiretap affidavit and to quash and traverse the wiretap warrant. We discuss our independent review below.

3

Prosecution witnesses Officer Hartman and Davell Galloway interpreted for the jury the coded language the Hoover gang members and their associates used to refer to guns, ammunition, drugs, the police, rival gang members, etc., during the 66 telephone calls. Galloway had been a member of the 9-Deuce set of the Hoover gang for about 20 years. He supplied guns and ammunition to the gang. At the time of trial, he had known Maddox for 10 years and Smith for four years and knew them both to be 7-4 Hoover gang members. Galloway participated in and was arrested for offenses charged in this case. He also was a participant in 10 of the 66 telephone calls played for the jury. He testified against defendants at trial in exchange for a 10-year plea deal. The trial court instructed the jury, "If the crimes of conspiracy to commit murder, attempted murder, assault with a firearm, and conspiracy to sell and transport cocaine were committed, then Davell Galloway is an accomplice to those crimes."

In addition to monitoring telephone calls over the wiretaps, the LAPD also conducted surveillance during June 2008 at various locations connected with defendants. The LAPD set up a camera to observe 7521 South Figueroa, known as the "Big House." The property had a front house and a back house. Smith lived in the back house. The LAPD also sent surveillance teams in vehicles to follow defendants leaving from and going to the Big House, 919 West 84th Street (known as "Granny's House"), and the Vagabond Inn motel. The prosecution presented evidence indicating Maddox had relatives who lived at Granny's House, and Maddox lived at the Vagabond Inn with his girlfriend, Ebony Lee.

**Charged Offenses and Supporting Evidence**

**June 7-8, 2008 conspiracy to commit murder (count 1)**

In count 1 of the second amended information filed February 24, 2011,[4] the prosecution charged defendants with a conspiracy to commit murder (§§ 182, subd. (a)(1)

---

[4] As Smith and the Attorney General did in their appellate briefs, we refer to the counts as they were charged in the second amended information, and listed in the June 28, 2011 minute orders from the sentencing hearing and the July 7, 2011 abstracts of judgment. The parties and the trial court renumbered the counts for the jury and on the

4

& 187) occurring between June 7 and 8, 2008, and alleged 11 overt acts in support of this conspiracy count. The prosecution presented evidence demonstrating defendants conspired to murder rival Denver Lane Blood gang members in retaliation for the murder of a 5-Deuce Hoover gang member (Cleveland Mouton) on June 6, 2008, and the murder of an 8-Trey Gangster gang member (Michael Smith) on June 7, 2008. The telephone calls described below were played for the jury.

In the evening on June 7, 2008, Maddox called his sister, Lakeisha, and asked her to get in touch with "Gangster" and let him know Maddox needed to talk to him. Maddox explained he wanted to talk to Gangster about "get[ting] that thing," which Officer Hartman interpreted to mean a gun. Maddox and Lakeisha then spoke about the murders of Michael Smith and Mouton (identified by Lakeisha as Gangster's nephew). Maddox told Lakeisha, "We going to speed this shit up out here and make it serious then . . . ."

A few minutes after the call with Lakeisha, Maddox spoke on the phone with Galloway. Galloway asked if Maddox had heard about what happened to Michael Smith. Maddox indicated that is what he wanted to talk about. He wanted to buy a gun because "[s]omething's gotta be ultimately done." Maddox asked Galloway, "How many little demons in that five thing you got?" According to Officer Hartman, Maddox wanted to know how many bullets Galloway had for a .45 caliber gun. Galloway told Maddox he had 10 bullets for the .45 and "eight in the other." At trial, Galloway explained that at the time of the call he had eight bullets for a .380 caliber handgun in his possession. Near the end of the call, Maddox told Galloway: "Oh, killer. Oh, killer. And then I could demo

---

verdict forms, but agreed the prosecution would not file a further amended information renumbering the counts. The parties used the renumbered counts in their sentencing memoranda, and the trial court accordingly referred to the renumbered counts when orally pronouncing judgment at the sentencing hearing. In his appellate briefs, Maddox refers to the renumbered counts, and asks this court to modify the abstracts of judgment to reflect the renumbered counts. We decline to do so. We believe potential future confusion can best be avoided if the record remains as it is, with the abstracts of judgment reflecting the counts as they were charged in the second amended information.

5

some. I want to put all ten in somebody sitting in in, in endsity [sic]." Officer Hartman interpreted this to mean Maddox wanted to use the gun to put 10 bullets into someone. Galloway understood that Maddox wanted to put 10 bullets into someone's face.

Immediately after the call with Galloway, Maddox spoke on the phone with William Lee Jackson, an 8-Trey Hoover gang member. Maddox told Jackson: "I need one of them big truck things, man. A big boy, man. A big big one, man. I need to buy one or something ASAP. They just knocked the homie Chip's son [Michael Smith] down." According to Officer Hartman, Maddox was saying he wanted to buy a large caliber handgun or rifle. Maddox also informed Jackson that the same rival gang killed Gangster's nephew (Cleveland Mouton).

About 30 minutes later, Maddox spoke on the phone with defendant Smith. Smith informed Maddox that he could obtain a .22 rifle, a 30-30 rifle or an M1 carbine rifle. Maddox indicated he was looking for a gun with a "[l]otta bam."

In the early afternoon on June 8, 2008, Galloway met Maddox at a Hoover hangout on 89th Street and gave Maddox a .380 handgun, loaded with eight hollow-point bullets, and a rented silver F150 pickup truck. In count 10 of the second amended information, the prosecution charged Maddox with carrying a loaded firearm on June 8, 2008 while being an active participant in a criminal street gang. (Former § 12031, subds. (a)(1) & (a)(2)(C).)

In the evening on June 8, 2008, Maddox and Smith spoke on the phone numerous times. In a call at 5:11 p.m., Smith asked Maddox if he had any ammunition. Smith commented that his "homie" Mad Trey, who was known to Officer Hartman as an 8-Trey gang member, had a large caliber gun but it did not have any bullets in it. Smith gave Maddox his location and told Maddox he was "waiting for Treymonk [sic] to come back." Officer Hartman also knew Trey Monk to be an 8-Trey gang member. Later in the call, Smith asked Maddox if he could obtain a rental car for Smith and his associates to use. Maddox told Smith there was a car parked "in the back where I'm at" that Smith could use, but it needed a jump start. Smith indicated he would use the car that evening. A few hours later, Officer Hartman and other officers observed—and used the

6

surveillance camera to take photographs of—several males wiping down and apparently jump starting a brown Hyundai car parked in back of the Big House.

In a call a couple of minutes later, Maddox told Smith, "I ain't doing nothing but fucking with the dicks for a minute." He added, "I'm going to give them a strong dickie demo." Officer Hartman explained at trial that Hoover gang members refer to rival Denver Lane Blood gang members as, "'dicks.'" According to both Officer Hartman and Galloway, Maddox was telling Smith he was going to shoot Denver Lane gang members. In the same call, Maddox told Smith, "3, 4, 5. Back to back. Bam, bam. Back to back. Bam, bam, bam." Galloway testified that Maddox was saying he wanted to kill three, four or five Denver Lane gang members back to back. Smith informed Maddox that he was "going to go by and check the studio out." Galloway explained at trial that Denver Lane gang members frequented a studio on 110th Street.

In a call at 8:01 p.m., Smith asked Maddox where he could find the car keys for the brown Hyundai. Maddox told him the keys were in the front house of the Big House. Smith informed Maddox he had "just spot[ted] two of them"—two Denver Lane gang members. In a call at 8:19 p.m., Maddox directed Smith to the particular place in the front house where he could find the car keys. Maddox told Smith, "Make sure everything is clean all the way visity [sic]." As discussed above, officers observed several males proceed to wipe down the brown Hyundai.

In a call at 9:12 p.m., Smith told Maddox he "just spotted one"—a Denver Lane gang member. Galloway testified that at the time of this call most Hoover gang members were looking for Denver Lane gang members. Also during this call, Smith asked Maddox if he could "get another one." Officer Hartman interpreted this to mean a gun. Maddox told Smith to meet him "on the four"—Granny's House on 84th Street—and pull into the alley behind the house.

Shortly after 9:00 p.m., LAPD Officer Debbie Guerrero and other members of the surveillance team saw the brown Hyundai drive away from the Big House. The officers followed the Hyundai to 84th and Hoover where the Hyundai proceeded down an alley. Officer Guerrero could see two people in the Hyundai.

7

In a call at 9:16 p.m., Smith let Maddox know he was in the alley. Maddox told Smith to park the car there, walk up to Granny's House, and wait for him.

**June 8, 2009 attempted murder (count 2)/assault with a firearm (count 15)**

Prosecution evidence

In count 2 of the second amended information, the prosecution charged defendants with the June 8, 2008 willful, deliberate and premeditated attempted murder of Officer Richard Jaramillo. (§§ 187, subd. (a) & 664, subd. (a).) Count 15, alleging defendants assaulted Officer Jaramillo with a firearm on June 8, 2008 (§ 245, subd. (a)(2)), is based on the same facts as count 2. The second amended information also charged Smith in count 7 with carrying a loaded firearm on June 8, 2008 while being an active participant in a criminal street gang. (Former § 12031, subds. (a)(1) & (a)(2)(C).)

Around 9:20 p.m. on June 8, 2008, as Maddox and Smith were preparing for an attack on rival Denver Lane Blood gang members, LAPD Officer Richard Jaramillo followed the silver F150 pickup truck as it left the Vagabond Inn. As the truck merged into traffic and Officer Jaramillo followed in an undercover car, he observed Maddox in the driver seat. An air unit (helicopter) kept track of Maddox as he drove in the direction of Granny's House. When Officer Jaramillo arrived on 84th Street, the F150 truck was parked at a residence. Officer Jaramillo also parked so he could observe Maddox. Officer Jaramillo saw Maddox walking around the truck and out onto the street, while holding something up to his ear that looked like a cell phone. Officer Jaramillo also saw Maddox look in his direction a couple of times. It was about 9:30 p.m. when Officer Jaramillo was making these observations. Officer Jaramillo was wearing blue jeans, a white t-shirt, a tactical vest over the t-shirt with the word "police" on the front and the back, and a jacket "over [his] shoulder."

At 9:33 p.m., Maddox called his girlfriend, Ebony Lee, and told her a car had followed him from the Vagabond Inn and was "sit[ting] there and waiting." Maddox instructed Lee to "[g]et over here with the thumper." According to Officer Hartman's testimony, in the context of this call, "thumper" means gun.

8

At about 9:35 p.m., five minutes after Officer Jaramillo had parked on 84th Street to observe Maddox, his supervisor called and told him to leave the area. Based on the intercepted call from Maddox to Lee, Officer Jaramillo's supervisor believed Maddox had noticed Officer Jaramillo's car and knew he was being followed. Officer Jaramillo waited 30 to 45 seconds and then "was able to use the cover of . . . two vehicles" driving on 84th Street to pull out and turn down the alley. Officer Jaramillo looked at Maddox before turning down the alley and noticed that Maddox was staring at him. In a 9:35 p.m. call from Lee to Maddox, after Lee greets Maddox, Maddox says, "That's it. That's it. Watch -- ay, ay, ay, ay," and then the call ends. In listening to this call, it did not sound to Officer Hartman like Maddox was directing those comments to Lee.

As Officer Jaramillo drove slowly down the alley, he heard something hit the rear windshield of the car. He thought it was a rock. A couple of seconds later, he "heard more things hitting [the] car," and heard gunshots. Realizing he "had been shot at," Officer Jaramillo ducked down, "floored it," and drove out of the alley as quickly as he could. He used his radio to notify other officers that he was being shot at and to give his location. About 15 seconds after the end of the 9:35 p.m. call between Maddox and Lee, described above, Officer Hartman heard a supervisor say that shots had been fired and an officer needed help.

When Officer Jaramillo had an opportunity to exit the car and inspect it, he noticed a "ricochet round on the rear driver's side rear window," "three impact rounds by the trunk and the lower bumper," and "another ricochet round on the top portion of the trunk on the driver's side." Officers later recovered from the alley where the shooting occurred seven .380 cartridge casings and a live hollow-point round.

The prosecution presented expert testimony from a special agent with the Federal Bureau of Investigation, who testified that cell phone tower records indicated Smith's and Maddox's cell phones were near each other in the area of Granny's House at around the time shots were fired upon Officer Jaramillo's car.

Numerous officers responded to Officer's Jaramillo's call for help and they set up a perimeter around the scene of the shooting. In a call between Smith and Maddox at

9

10:02 p.m., about 25 minutes after the shooting, Smith asks Maddox if they are going to "meet up, right back there." Maddox tells him no because "[t]hey got swinine all over here." Officer Hartman testified that "swinine" is "a code word Hoover gang members use for the police."

LAPD Sergeant Marco Lozano was part of a surveillance team watching Maddox after the shooting. Shortly after midnight, he observed Maddox walking up and down the sidewalk in front of Granny's House, talking on a cell phone. The silver F150 pickup truck was parked in the driveway of Granny's House. The brown Hyundai was parked in the alley behind Granny's House.

At 12:29 a.m. on June 9, 2008, Smith and Galloway spoke on the phone with Maddox. Galloway had just picked up Smith at the Big House and they were driving to a liquor store. During the call, Galloway asked Maddox if "the wheels cool," meaning if the F150 pickup truck Galloway gave Maddox was okay. Maddox responded, "Oh yeah. We straight. They ain't touching the yard or nothing." Galloway told Maddox he "still" had the keys for the truck and indicated he would bring them to Maddox, but he and Smith were going to stay away from Granny's House until the police cleared out of the area.

According to Galloway's trial testimony, on the drive to the liquor store he and Smith had to pass by the perimeter and they saw officers searching the area. Smith told him "he bust on a car on 84th that was acting suspicious and he wasn't sure who it was, if it was rival enemies, that they were following Maddox." Galloway asked Smith where he put the .380 gun, and Smith told him "it was in a safe place." Smith also told Galloway "the gun worked well."

During a call at 1:22 a.m. on June 9, 2008, Maddox asked Smith if he thought the person in the car (Officer Jaramillo) had "wrecked" because "he was driving real fast." Smith responded that he did not know. Smith expressed concern that the person in the car was "a relation to" Maddox, and Maddox assured him that was not the case. At the end of the call Maddox sang the following words to Smith: "She got off the boy, intelligent boy, fuck these fucking cops up." Officer Hartman testified that Maddox took

10

these words from a rap song and changed them slightly. Officer Hartman believed Maddox had "figured out now that the victim was a police officer" and he was "singing his [Smith's] praises of what ha[d] happened."

Galloway and Maddox spoke on the phone at 11:28 a.m. on June 9, 2008. Galloway stated he had just picked up a 30-30 rifle but it needed bullets. Maddox told Galloway he was "trying to see what's up with that other unit." Galloway responded that he had "just hit Groove and told him to get up and recover the bitch." Galloway explained to Maddox that he and "Groove" were drinking alcohol the night before and he ("Groove") was "half asleep still." According to Officer Hartman, in the context of this call, "unit" and "bitch" mean gun. "Groove" is a generic term Hoovers use to refer to others. Galloway testified at trial that he was referring to Smith in this call when he used the word "Groove," and he was letting Maddox know that he had told Smith to wake up and retrieve the .380 gun.

During the same 11:28 a.m. call, Maddox informed Galloway that he told someone, "'Take a shower. Get out that shit.' Calm down, get out, stop sweating." Galloway testified at trial that Maddox was letting him know he had told "Smith to calm down and stop sweating after the shooting" of Officer Jaramillo. Maddox also commented during the call, "[n]othing but professional shit on his end," and "he get his next stripe" and "a G-roller." According to Galloway's testimony, Maddox was indicating that Smith had taken care of business professionally, would be "recognized for a job well done," and would be rewarded with $1,000.

Galloway also testified at trial about a meeting he had later in the day on June 9, 2008 with Maddox and Smith. Galloway picked up Maddox at the Vagabond Inn and drove him to the Big House. Smith was home, inside the back house of the Big House. The three men discussed the shooting. Maddox stated that a car had followed him to 84th Street. After the car parked, Maddox told Smith he had been followed and pointed out the car. Smith crouched down between cars parked across the street from Officer Jaramillo's car. As he started to approach Officer Jaramillo's car, the car pulled out into traffic and turned down the alley. Smith "went into the alley and opened fire," firing all

11

of the rounds in the .380 gun. When Smith returned the .380 gun to Galloway on June 9, 2008, there were two rounds inside the gun, but they were not rounds that Galloway had provided.

Defense evidence

In his defense at trial, Smith called Jose Villanueva and Marcos Vellos who testified that, in the evening on June 8, 2008, they were socializing in a group outside 927 West 84th Street and drinking alcohol, when they saw a man (not Smith) with his hand in his pocket walk toward the alley behind Granny's House. After the witnesses heard gunshots, they saw the man run away and then noticed a white car speed out of the area.

Villanueva had known Maddox and his family for many years. Villanueva saw Maddox on 84th Street in the hour before the shooting. At that time, Maddox gave Villanueva a cigar and told Villanueva to roll it up with marijuana. Villanueva smoked some of it and gave it back to Maddox. Villanueva and Smith were friends. Villanueva had attended a prior court hearing in this case to show his support for Smith. Vellos was a friend of Villanueva, but did not know Smith or Maddox personally.

**June 17, 2008 conspiracy to commit murder (count 3)**

In count 3 of the second amended information, the prosecution charged defendants with a conspiracy to commit murder occurring on June 17, 2008, and alleged 13 overt acts in support of this conspiracy count. The prosecution presented evidence demonstrating defendants conspired to murder rival 65 Menlo Gangster Crip gang members.

At 6:49 p.m. on June 17, 2008, Smith spoke on the phone with Harry Wallace, a fellow 7-4 Hoover gang member. Wallace told Smith that 8-Trey Gangster gang members (7-4 Hoover allies) were going to shoot 67 Neighborhood Crip gang members that evening, and 7-4 Hoover gang members (Maddox and Smith's gang) were "supposed to" shoot 65 Menlo Gangster Crip gang members at the same time in a coordinated attack. Smith let Wallace know he might have a gun for him to use. Wallace stated that he had associates ready to carry out the attack.

12

Less than 10 minutes later, at 6:57 p.m., Smith spoke on the phone with Galloway and relayed to him the plan about the coordinated attack on Crip gang members. Smith told Galloway he was going to pick up a 30-30 rifle. Galloway told Smith he needed ammunition for the other 30-30 rifle Smith had. Galloway asked Smith, "Ain't the boy on deck with the chunky shit?" Galloway explained at trial that he was asking Smith if Wallace had an AK-47 assault rifle because Galloway was under the impression that Wallace did. During this call, Galloway also asked Smith, "And did the boy come through with the other piece to that?" Galloway testified that he had a .45 gun that was jamming and Smith had somebody look at it to see if it could be fixed. Galloway was asking Smith about the status of the repair.

At 7:02 p.m. the same evening, Smith called an unidentified man and asked if he could use the man's gun while the man held onto Smith's gun. The man agreed. Smith said he would find a ride to the man's location.

Smith spoke on the phone with Maddox at 7:10 p.m. and told him Wallace had made a plan with 8-Trey gang members. According to Officer Hartman's testimony, Smith was seeking Maddox's approval because Maddox was a leader in the gang. Maddox gave his approval by stating, "All right. All right. That's the BI," meaning, "that's the business."

During a call at 7:23 p.m., Smith and Wallace spoke about the plan. Wallace told Smith he needed a car. Smith explained that "Conrad," also known as Dazhawn Tyler, a 7-4 Hoover gang member, had a 2008 Dodge Avenger at his residence on 79th Street that they would use. Wallace stated that the Hoover gang members who were going to carry out the shooting needed a gun. Wallace told Smith that he would be "trailing" behind the shooters in a different car. Smith told Wallace that one of their associates had a 30-30 rifle or an M1 rifle, but it did not have a clip. Another associate had a 30-30 rifle with 12 rounds. During a subsequent call at 8:37 p.m., Wallace told Smith one of their associates had a .45 gun, but Smith stated he did not know if that man was going to come along that evening.

13

Smith spoke on the phone with Galloway at 8:40 p.m. and asked Galloway if he could use his gun. Galloway told him it did not have any bullets in it. Smith stated he would take bullets from another gun and put them in Galloway's gun. Galloway explained at trial that Smith wanted to use Galloway's 30-30 rifle instead of his own because Galloway's rifle had a longer clip and held more bullets.

According to Galloway's trial testimony, Galloway picked up Smith at the Big House at about 9:00 p.m. on June 17, 2008, and drove him to another location to pick up a 30-30 rifle. From there, Galloway drove to Dazhawn Tyler's residence on 79th Street, where Smith placed the rifle in the trunk of a Buick car parked in the back of Tyler's residence. Galloway and Smith drove away from Tyler's residence, with Tyler and two other men following behind in a silver Dodge Avenger. They drove to another location where Galloway picked up his unloaded 30-30 rifle and handed it to a man sitting in the back seat of the Avenger. Galloway did not know the two men driving with Tyler.

At 9:29 p.m., presumably in the midst of these travels with Galloway, Smith spoke on the phone with Wallace and told him there were younger associates following him who were going to put the gun in their trunk. Smith also told Wallace he needed ammunition for the gun, and asked Wallace if he could get another gun. Wallace informed Smith he had a .32 gun, but did not have bullets for it. At 9:32 p.m., Smith spoke on the phone with Maddox and told him he had a .32 gun, but no ammunition for it. Maddox asked Smith if anyone had used the gun to see if it was working properly. Smith said no one had tried out that gun, but someone had used the other gun and it was working fine.

After picking up his 30-30 rifle and giving it to a man in the Dodge Avenger, Galloway followed the Dodge Avenger back to Tyler's residence.[5] According to Galloway, Smith exited the car and had a conversation with Wallace in front of Tyler's

---

[5] A police surveillance unit followed Galloway's car and the Dodge Avenger as the cars left Tyler's residence, stopped at a couple of locations, and then drove back to Tyler's residence.

14

residence. Galloway joined the conversation and told Wallace to return the 30-30 rifle to Smith "when they got back from them doing their thing"—the attack on rival gang members—and he would pick up the rifle from Smith the next morning. Wallace agreed. Galloway drove Smith back to the Big House and then Galloway went home.

During a call at 11:19 p.m., Smith informed Maddox that the young Hoover gang members were ready to leave the location and carry out the plan to attack rival gang members. At about 11:40 p.m., a police surveillance unit followed the Dodge Avenger and a white car as they left Tyler's residence and made stops at two other locations. Sometime after midnight on June 18, 2008, the surveillance unit terminated surveillance while following the two vehicles "due to erratic driving."

In a call at 12:31 a.m. on June 18, 2008, Tyler told Smith about the shooting. Tyler stated that he was hanging out the window of the car, close to the intended target of the shooting, but the 30-30 rifle did not fire properly. The .45 gun fired once and then it jammed. At 1:52 a.m., Smith spoke on the phone with Maddox and indicated the shooting did not go as planned and he (Smith) was not happy about it.

At 6:02 a.m., Smith spoke on the phone with Galloway and expressed his dissatisfaction with the results of the shooting. Smith indicated that the victim had only been "[s]cratched," not killed. Smith told Galloway the shooters only had one of the 30-30 rifles and a .45 gun. In a call with an unidentified man at 2:59 p.m., Smith again expressed his disapproval with the manner in which the shooting was carried out. Smith explained that he had instructed Wallace to tell the shooters "how to do it"—to park and wait for a rival gang member to come by, and not just pull up in a car and start shooting. The man asked Smith who the intended target was and Smith informed him it was a 65 Menlo Gangster Crip gang member.

No eyewitness testified at trial about the shooting. There was no police report made and police never identified a victim of this shooting.

**May 10-July 16, 2008 conspiracy to transport and sell cocaine (count 6)**

In count 6 of the amended information, the prosecution charged defendants with a conspiracy to transport and sell cocaine (§ 182, subd. (a)(1) & Health & Saf. Code, §

15

11352) occurring between May 10 and July 16, 2008, and alleged 12 overt acts in support of this conspiracy count.

At trial, the prosecution played for the jury more than 20 telephone calls during which Maddox, Smith, Galloway and others discussed the transportation and sale of cocaine. Detective Daniel Jenks, who has background, training and experience regarding transportation and sale of cocaine, testified about these telephone calls during which the parties discussed quantities, prices and arrangements for the delivery of cocaine.

Galloway testified that rock cocaine was cut up, weighed, wrapped up and sold at the Big House. Galloway was present on occasions when drug transactions were conducted at the Big House. Galloway was aware that cocaine was transported between the Vagabond Inn and the Big House. On one occasion, Galloway drove with Maddox to the Vagabond Inn in the F150 pickup truck, and Maddox "had the cocaine stashed inside the headliner of the truck."

In the evening on June 19, 2008, officers riding in an unmarked patrol car stopped to investigate the smell of marijuana around the Big House. The officers observed Tyler and another man conduct a hand-to-hand drug transaction. The officers ordered the two men and Smith, who was standing nearby, to show their hands. Smith grabbed his waistband and backed into the house. One of the officers believed he saw a gun in Smith's waistband. The officers requested backup and a perimeter was set up around the Big House. A SWAT team extracted Smith from the Big House in the morning on June 20, 2008. Smith was arrested. During a search of the Big House, officers recovered a digital scale and a razor, both with white powder on them, in the front house.[6]

In a telephone call on June 21, 2008, Maddox informed Galloway that he had another location where drugs could be sold now that the Big House had been raided and drugs could no longer be sold there.

---

[6] Officers also recovered a rifle and ammunition in the back house (where Smith lived) and another rifle in the front house.

**Sentencing**

Before the jury returned the verdicts, each defendant admitted the special allegation in the second amended information that he had suffered a prior strike conviction within the meaning of the "Three Strikes" law (§§ 667, subds. (b)-(i) & 1170.12, subds. (a)-(d)), a 1993 robbery for Maddox and a 2003 first degree residential burglary for Smith. The jury found defendants guilty of all of the charged offenses, and found true all of the gang and firearm enhancement allegations in the second amended information.

The trial court sentenced Maddox to 114 years to life plus 69 years in prison. On count 1 for conspiracy to commit murder, the court imposed a term of 50 years to life plus 5 years: 25 years to life for the offense, doubled under the Three Strikes law, plus 5 years for the prior serious felony enhancement under section 667, subdivision (a)(1).[7] On count 2 for willful, deliberate and premeditated attempted murder, the court imposed a consecutive term of 14 years to life plus 25 years: 7 years to life for the offense, doubled under the Three Strikes law, plus 20 years for the firearm enhancement under section 12022.53, subdivisions (c) and (e), and 5 years for the prior serious felony enhancement. On count 3 for conspiracy to commit murder, the court imposed a consecutive term of 50 years to life plus 25 years: 25 years to life for the offense, doubled under the Three Strikes law, plus 20 years for the firearm enhancement, and 5 years for the prior serious felony enhancement. On count 6 for conspiracy to transport and sell cocaine, the court imposed a consecutive term of 14 years: the upper term of 5 years for the offense, doubled under the Three Strikes law, plus 4 years for the gang enhancement under section 186.22, subdivision (b)(1)(A). On count 10 for carrying a loaded firearm while being an active participant in a criminal street gang, the court imposed a concurrent term of 6 years: the upper term of 3 years for the offense, doubled under the Three Strikes law.

---

[7] As discussed below, we reverse the prior serious felony enhancements under section 667, subdivision (a)(1), because the enhancements were not alleged in the second amended information and defendants did not admit to them.

17

On count 15 for assault with a firearm, the court stayed the 13-year sentence: the upper term of 4 years for the offense, doubled under the Three Strikes law, plus 5 years for the prior serious felony enhancement.

The trial court sentenced Smith to 130 years to life plus 69 years in prison. Smith's sentence was the same as Maddox's except on count 2 for willful, deliberate and premeditated attempted murder. The court imposed a term of 30 years to life plus 25 years: 15 years to life for the offense, doubled under the Three Strikes law, plus 20 years for the firearm enhancement under section 12022.53, subdivision (c), and 5 years for the prior serious felony enhancement.[8]

## DISCUSSION

### *Wheeler/Batson* Motion

Asserting the prosecutor's reasons for striking two prospective African-American jurors (jurors 3488[9] and 8913) were pretextual, Maddox contends the trial court erred in denying his *Wheeler/Batson* motion. Maddox and Smith are both African-American men.

#### Proceedings below

Neither defendant objected to the prosecutor's use of peremptory challenges until the prosecutor exercised his 28th challenge on prospective juror 8913. At that point, Maddox made a *Wheeler/Batson* motion, arguing the prosecutor had "challenged well over 50 percent of the potential African-American trial jurors." Maddox's counsel stated the prosecutor had used peremptory challenges on three African-American men (jurors

---

[8] The only other difference is that Smith was charged with carrying a loaded firearm while being an active participant in a criminal street gang in count 7 of the second amended information, while Maddox was charged with that offense in count 10.

[9] According to the reporter's transcript, when this prospective juror was first called up to the jury box, the clerk referred to this prospective juror as "Juror number 3448," not 3488 as Maddox in his opening brief and the Attorney General refer to this juror on appeal. Because Maddox's trial counsel and the prosecutor also referred to this prospective juror as juror 3488 in connection with defendants' *Wheeler/Batson* motion, we will do the same, although we note the discrepancy.

18

3559, 6179 and 8913) and three African-American women (jurors 3488, 2309 and 1991). Counsel also commented that juror 8913 was "a very articulate potential juror."

The trial court stated that it had "been keeping track of the racial characteristics as well as the answers of each individual juror," and did not find that Maddox had made a prima facie case of group bias. "[I]n order to preserve the record," the court "invite[d] the People to state any reasons for excusing all of the jurors that have been identified by [Maddox's counsel]."

The prosecutor stated: "My concern for 8913 is that there is a sympathy for the defendants in this case, because they are gang members, because he said he has a cousin who is in a street gang as well as he has a nephew who is currently incarcerated and serving time and whom he gives money to. And because of that, I'm concerned about any sort of sympathy towards the defendants. [¶] As well as his answers of familiarity towards gangs, I'm concerned about any sympathy towards the defendants."

Regarding juror 6179, the prosecutor stated: "[T]hat individual discussed how his friends got a beat-down by the cops at a rave concert, as well as how family members and friends are members of criminal street gangs, and he doesn't feel that he was capable of serving as a juror. [¶] And that was the individual that also wanted to go back to school. I was concerned that he wasn't going to be able to concentrate for this trial, as well as sympathy for gang members and problems with the officers that would have to testify in this case, because of his friends' beat-down by L.A.P.D., as he explained."

With respect to juror 1991, the prosecutor stated: "[T]his juror, like many jurors, had expressed hardship because of financial reasons. However, she expressed it several times, because she was self-employed in the retail business and said she would have concern for the -- financial concern for her business, that it would in essence be a disaster. So that juror was moved on -- was excused for that reason."

Regarding juror 3488, the prosecutor stated: "[T]hat juror had a neighbor who was an ex-gang member. I was concerned for sympathy again for these defendants, if the defense would be if they are not gang members any more or that they used to be. [¶] Also she was a member of a hung jury. And with specific questioning trying to find

19

where she was coming from and that hung jury [sic] was asked, one, whether or not she -- the jury was hung because of an honest difference of opinion amongst the jurors or, two, if one or two of the jurors were being unreasonable. She answered both. The prosecution was not able to get to the heart of where she was coming from on this, and because she was a member of a hung jury the People were concerned that she would have an issue of hanging this specific jury, also. [¶] And that particular juror also mentioned an issue with the police where there was a problem of wrongful I.D., someone used her I.D., however, she got caught up with the police because of that wrongful I.D. And the potential for her to hold that against any officer who may testify in this case, I didn't want that to play a part in this trial, so she was excused for that reason."

With respect to juror 3559, the prosecutor stated: "This is a juror who stated many times that [he] had a hardship because of being a student and he didn't want to miss school, and then went so far as having a doctor's note presented that he had asthma. Because of that, and so he would not miss any of his schooling, the People dismissed that juror."

Finally, regarding juror 2309, the prosecutor stated: "[T]hat juror had obvious problems in walking and getting to her seat. It took her -- 50 percent more time than all the other jurors to sit down. She was walking with a cane. She also discussed how she had very high blood pressure. [¶] She felt that she could not judge guilt. She said she simply could not do it. And said that both her sons are gang members. And the People were concerned for sympathy for the defendants in this case."

In response, Maddox's counsel stated: "I think that the People's answers are highly suspect. They have dismissed half of -- according to the People, half of their dismissals of African-American jurors have been based on sort of good Samaritan principles, letting people go for financial hardship where the court wouldn't, or letting a juror go because of a perceived physical disability, when the court wouldn't do that. [¶] I find the coincidence of this compassion directed towards the African-Americans when the People can't present any consistent record of supplying the compassion that the court failed to supply with regard to other jurors entirely suspect. [¶] The net effect is that you

20

have two African-American defendants who are being tried to a jury which the prosecution has systematically purged of African-American jurors, and we object." Smith joined in the objection.

The trial court commented: "I'll make the additional observation that I have had the opportunity to observe the demeanor of the prosecutor as he has made his representations to the court, and have observed no inkling that he has used the reasons that he has stated as a pretext for excusing the jurors in a discriminatory manner, and that would include his tone of voice and other mannerisms before the court."

After the defense exercised two additional peremptory challenges and the prosecutor exercised one additional peremptory challenge, without objection, the parties accepted the panel.

During selection of alternate jurors, the prosecutor exercised two peremptory challenges and the defense exercised one, without objection. After the prosecutor struck his third prospective alternate juror (juror No. 1), Maddox renewed his objection under *Wheeler/Batson*. His counsel stated: "[T]he People have systematically purged the 12 jurors of African-Americans. They have now excused the only remaining African-American person in the panel, who was seated as an alternate juror. [¶] I believe that the notion that people are being excused because of some familiarity with the material that is to be litigated is disingenuous, since those people who are both Latino and African-American who live in the neighborhoods where there is gang activity are obviously going to be familiar with it. It happens in their neighborhood. And what [the prosecutor] has done is systematically banished everyone who might be able to view his gang expert testimony with a critical eye based on personal experience. He has also systematically banished all, save one, potential African-American jurors. [¶] I believe that both under Wheeler and Batson, this is absolutely improper. I object, and I move for a mistrial." Again, Smith joined in the objection.

The trial court stated: "I do not find that there is a prima facie case established with respect to juror number 1. To note, this was a borderline juror whether I would

excuse her for cause because she wouldn't be fair to the trial. [¶] But again, once again, I would invite the People, if they wish, to state the reasons for excusing number 1."

The prosecutor responded: "The People exercised the p[er]emptory challenge with regards to juror number 1 because she stated the system was not fair. She stated that officers get off for shooting an individual in the back even if it's on video. The People are concerned in [sic] her holding that against the many officers that would testify in this case. [¶] As well as she discussed a family member whom she felt the police planted something on him, which that family member now is on death row. Again the People are concerned that she would hold that against any officer that may testify in this case. As well as she has a son that was prosecuted by my office formerly, although a not-guilty verdict was found, and the People are concerned that she would then hold that against myself, being from the same prosecuting agency."

The trial court noted: "And there is one African-American female on the panel of the 12 that has already been selected. And on this present panel, the only African-American panel member [sic]." The court also commented: "The only thing I will additionally state is, having witnessed the demeanor of the prosecutor, I do not find that the reasons that he stated were in any way pretextual and his sincerity, as judged by his body language and expressions, is confirmed, in the court's opinion."

There were no further objections during the selection of alternate jurors.

On appeal, Maddox takes issue with the excusal of only two of the seven prospective jurors who were the subjects of his *Wheeler*/*Batson* motions, jurors 3488 and 8913.

### Applicable law

"Both the federal and state Constitutions prohibit any advocate's use of peremptory challenges to exclude prospective jurors based on race. (*Batson*, *supra*, 476 U.S. at p. 97; *Georgia v. McCollum* (1992) 505 U.S. 42, 59; *Wheeler*, *supra*, 22 Cal.3d at pp. 276-277.) Doing so violates both the equal protection clause of the United States Constitution and the right to trial by a jury drawn from a representative cross-section of the community under article 1, section 16 of the California Constitution. [Citations.]"

22

(*People v. Lenix* (2008) 44 Cal.4th 602, 612.)  "The Batson three-step inquiry is well established.  First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge based on race.  Second, if the showing is made, the burden shifts to the prosecutor to demonstrate that the challenges were exercised for a race-neutral reason.  Third, the court determines whether the defendant has proven purposeful discrimination.  The ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.  [Citation.]  The three-step procedure also applies to state constitutional claims.  [Citations.]"  (*Id.* at pp. 612-613.)

"When a trial court denies a *Wheeler* motion because the movant failed to establish a prima facie case of group bias, the reviewing court examines the entire record of voir dire for evidence to support the trial court's ruling.  [Citation.]  The ruling is affirmed if the record 'suggests grounds upon which the prosecutor might reasonably have challenged the jurors in question.'  [Citation.]"  (*People v. Young* (2005) 34 Cal.4th 1149, 1172-1173.)  "Moreover, if we find that the trial court properly determined that no prima facie case was made, we need not review the adequacy of the prosecution's justifications, if any, for the peremptory challenges.  [Citation.]"  (*People v. Farnam* (2002) 28 Cal.4th 107, 135.)

**Analysis**

The trial court found defendants did not make a prima facie showing of group bias.  Accordingly, we have examined the entire record of voir dire.  For the reasons set forth below, we conclude the trial court did not err in denying defendants' *Wheeler*/*Batson* motion as to jurors 3488 and 8913, the only two prospective jurors at issue on appeal.

Juror 3488

In providing the required biographical information during voir dire, juror 3488 (who was referred to as prospective juror No. 16 at that time) stated she was from Alhambra, was a registered nurse at USC Medical Center, and was single.  She had served on a jury in a criminal trial that resulted in a hung jury.  In responding to the trial

23

court's inquiry about victims of violent crime, juror 3488 stated she had been a victim of spousal abuse. When the court inquired about close relationships with persons in criminal street gangs, juror 3488 stated her neighbor was an ex-gang member.

The prosecutor asked juror 3488 about her prior jury experience during the following exchange:

"[Prosecutor]: . . . [¶] Ma'am, juror number 16, you described that you had sat on a case where there was a hung jury?

"Prospective Juror No. 16: Uh-huh.

"[Prosecutor]: Did you find that to be a frustrating experience?

"Prospective Juror No. 16: Yes and no.

"[Prosecutor]: Okay. All right. [¶] Well, let me ask you this. I want to give you a couple different categories to choose from and see if any of them fit. [¶] Do you believe that that resulted in a hung jury because one or more jurors was being unreasonable or because there was an honest difference of opinion amongst the jurors?

"Prospective Juror No. 16: It was actually both.

"[Prosecutor]: Does that explain the yes and the no?

"Prospective Juror No. 16: Yes.

"[Prosecutor]: Could you set that aside if you are chosen to be a juror in this matter?

"Prospective Juror No. 16: Sure.

"[Prosecutor]: And if you recall -- and again, not how it was being voted one direction or the other, but what was the charge that that was, if you recall?

"Prospective Juror No. 16: It was murder, gang related." (Bold font omitted.)

Juror 3488 raised her hand when the prosecutor asked if any juror, friend or relative had been arrested, charged or convicted of a crime. The following exchange occurred:

"[Prosecutor]: . . . [¶] Juror number 16, did you raise your hand?

"Prospective Juror No. 16: Yes, I did. Friends, D.U.I.'s. Neighbors, controlled substance. Myself for theft with wrongful I.D. And other family members with controlled substances.

"[Prosecutor]: As far as the D.U.I.'s and the controlled substance, do you believe that anyone was treated unfairly by law enforcement?

"Prospective Juror No. 16: No.

"[Prosecutor]: What about in the court system?

"Prospective Juror No. 16: It was fair.

"[Prosecutor]: Now, you said that you were wrongfully identified in a theft?

"Prospective Juror No. 16: Yes, my neighbor stole my I.D., and she had robbed Sears, and I was pulled over for a traffic arrest.

"[Prosecutor]: And so you were arrested?

"Prospective Juror No. 16: Yes.

"[Prosecutor]: With what occurred there -- well, were you treated fairly by the law enforcement?

"Prospective Juror No. 16: If you were going by the books, yes. It's just --

"[Prosecutor]: It was tough because of the I.D.?

"Prospective Juror No. 16: And it was an officer who was in training, so he couldn't just write me a ticket and let me go.

"[Prosecutor]: Was it fair after that?

"Prospective Juror No. 16: No. I went through the system. Well, I hadn't been through the system so there were some challenges, but it was eventually dismissed.

"[Prosecutor]: Was your identification able to be cleared?

"Prospective Juror No. 16: It was difficult, because I performed my own handwriting test, and I failed. They said it was really nerves, and it was eventually dismissed.

"[Prosecutor]: Would you be able to set that aside if chosen as a juror here?

"Prospective Juror No. 16: Yes." (Bold font omitted.)

The prosecutor exercised six other peremptory challenges between the time juror 3488 was questioned and the prosecutor excused her.

Juror 8913

In providing the required biographical information during voir dire, juror 8913 (who was referred to as prospective juror No. 13 at that time) stated he was retired, used to be a legislative lobbyist in Sacramento representing business entities, had never been married, and had no adult children and no prior jury experience.

In responding to the trial court's questions, juror 8913 stated he had a cousin who was a detective with the Los Angeles County Sheriff's Department, had known both prosecutors and defense attorneys, and had "[a] cousin that was a player in one of the street gangs." He also informed the court he had a family friend who was murdered four days before, "found with his throat cut and shot in the head." He stated the crime was reported in the newspaper and the perpetrator had not been caught. He offered to "elaborate" on the circumstances of the crime, but the court declined the invitation.

During an exchange with Smith's counsel, juror 8913 stated he did not want to serve on the jury because he was "not motivated" to do so. When Smith's counsel told him the issues in the case would be interesting, he changed his outlook. Smith's counsel asked juror 8913 how a person becomes a lobbyist and he responded: "You spend years in politics. And if you develop a reputation for getting things done, someone may employ you to work on issues." Juror 8913 told Smith's counsel he had been a political appointee for Governor Deukmejian, and that his background as a "political operative" helped him secure the appointment.

When Maddox's counsel asked the prospective jurors, "Has anybody, just looking at me, taken such an intense dislike to me that you can't be fair to Mr. Maddox," juror 8913 responded: "I don't think so. Although you look familiar to me." They discussed the fact that they were both from Pasadena and perhaps that was why Maddox's counsel looked familiar to juror 8913.

Maddox's counsel questioned juror 8913 about his work as a political operative and a lobbyist for oil and gas clients. Juror 8913 explained that when he worked for the

26

Governor, he "was involved with locating lawyers to be recommended for judgeships." The prosecutor asked juror 8913 some follow-up questions about his work with the Governor's Appointments Secretary, Marvin Baxter, current California Supreme Court Justice.

The prosecutor also asked juror 8913 what he did in his spare time and he responded: "I'm currently studying hospitality and hotel management at a local community college. [¶] I suffered a stroke and was forced into retirement."

The prosecutor inquired about juror 8913's cousin who was a gang member. Juror 8913 explained that his cousin was, at that time, a current member of a Blood gang in Pasadena. He was not close with his cousin, but believed that connection with a gang "certainly would impact [his] outlook." Juror 8913 elaborated: "I have some awareness of the nature of those things and, you know, why they function in our society. And I've known numerous people that have been active in various capacities. I personally grew up with probably one of the most notorious people from the Pasadena area." The prosecutor asked juror 8913: "Would the fact that you grew up with some people in gangs, is that going to cause you to have some sympathy towards the defendants in this case if it is proven that they are members of a gang?" He responded: "Would it? I could not say. I mean, stating that, I could not say that it would or would not. I would say I have an understanding of that world. I have a nephew that's currently serving time in the state penitentiary" (for burglary). Juror 8913 stated that he did not visit his nephew in prison, but would "send him money monthly."

The prosecutor asked the prospective jurors to raise their hands if they would dismiss and decline to listen to the testimony of a gang member testifying under a grant of immunity or leniency. Juror 8913 was the only prospective juror to raise a hand. He stated: "I would be less likely to. I'd be less likely to give as much weight to someone testifying under that circumstance than I would someone who was not, because a person under that circumstance has incentives." The prosecutor followed up: "And you can take that, things like that into consideration, sir. [¶] However, would you listen to the testimony to see if there's corroborating evidence? Or would you simply dismiss it and

27

not listen to it?" Juror 8913 responded: "No, I would listen for the additional information. I would not dismiss it out of hand. But it would certainly be there in my way of thinking about that particular individual."

The prosecutor used his next peremptory challenge to excuse juror 8913. Immediately thereafter, defendants made their *Wheeler*/*Batson* motion.

No prima facie case

Based on our review of the entire record of voir dire, we find there were reasonable and race-neutral reasons for the prosecutor's challenge of jurors 3488 and 8913.

Juror 3488 served on a jury which did not reach a verdict in a criminal case involving subject matter similar to this case—a gang-related murder trial. She was arrested for a crime she did not commit and went through a difficult and protracted battle with law enforcement to clear her name. She was subjected to a process she did not believe was fair. Although juror 3488 stated she could put aside her negative experience with law enforcement while serving as a juror in this case, her answers gave cause for concern that she might view an officer's testimony with skepticism.[10]

Juror 8913 expressed familiarity with gangs and gang culture. Not only did he state his cousin was a "a player" in a Blood street gang in Pasadena, but he also stated he "personally grew up with probably one of the most notorious" gang members in the Pasadena area whom he identified by name. Juror 8913 believed his familiarity with gangs "certainly would impact [his] outlook" on this case. He could not say he would put

---

[10] In his appellate reply brief, Maddox noted the prosecutor did not remove juror 5373 (prospective juror No. 17 at that time) who cited arrests for possession of marijuana, possession of methamphetamine and cultivation which did not result in any court proceedings. Maddox describes juror 5373's experience as "a run-in with police." The key difference between juror 5373's experience and juror 3488's experience is that juror 3488 indicated she was treated unfairly during her difficult and protracted battle with law enforcement. When the prosecutor asked juror 5373, "Do you have an opinion one way or another whether or not you were treated fairly by law enforcement," juror 5373 responded: "Yeah, they were cool."

28

aside his own personal experiences with gangs while serving as a juror in this case. He was the only juror who admitted he would give less weight to the testimony of a gang member testifying under a grant of immunity or leniency. Galloway, a Hoover gang member testifying under a leniency agreement, was a key witness for the prosecution.[11]

Because "we find that the trial court properly determined that no prima facie case was made, we need not review the adequacy of the prosecution's justifications . . . for the peremptory challenges. [Citation.]" (*People v. Farnam*, *supra*, 28 Cal.4th at p. 135.)

We note that, in reviewing defendants' *Wheeler*/*Batson* motion, we have considered all circumstances of voir dire including the questioning of all of the prospective jurors, the number of African-American prospective jurors struck from the panel, and a comparison between the prospective jurors struck by the prosecutor and those the prosecutor passed. We conclude the trial court did not err in denying the motion.

**Substantial Evidence Demonstrates Smith Fired Shots at Officer Jaramillo**

Smith contends his convictions for willful, deliberate and premeditated attempted murder and assault with a firearm must be reversed because there is insufficient evidence demonstrating he fired the gunshots that hit Officer Jaramillo's car as Officer Jaramillo

---

[11] In his opening appellate brief, Maddox asserted that "the prosecution did not kick off Juror 8472 who lived in South Central Los Angeles, had cousins that were gang members," and apparently was not African-American. As the Attorney General pointed out in her respondent's brief, and Maddox conceded in his reply brief, the *defense* exercised a peremptory challenge to excuse juror 8472 after the defense unsuccessfully challenged this prospective juror for cause.

In his appellate reply brief, Maddox noted the prosecutor did not remove juror 2431 (prospective juror no. 16, then 11) even though she stated she had cousins and friends who were gang members. The prosecutor did not ask her any follow-up questions regarding the gang membership of her cousins and friends like he did with juror 8913. Maddox argues the prosecutor engaged in "disparate questioning" of juror 8913 because he is African-American. Maddox cannot show group bias because the race of prospective juror 2431 is not clear from the record. In connection with defendants' *Wheeler*/*Batson* motion, the trial court stated for the record that an African-American woman was selected as a juror in this case. We cannot determine if juror 2431 was that African-American woman.

29

drove through the alley behind Granny's House.  Smith argues the accomplice testimony of Galloway was not sufficiently corroborated by other evidence.

"In assessing a claim of insufficiency of evidence, the reviewing court's task is to review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citation.]  The federal standard of review is to the same effect:  Under principles of federal due process, review for sufficiency of evidence entails not the determination whether the reviewing court itself believes the evidence at trial establishes guilt beyond a reasonable doubt, but, instead, whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  [Citation.]  The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence.  [Citation.]  . . . ""'"If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.'" [Citations.]"'  [Citation.]"  (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.)

Section 1111 provides, "A conviction can not [sic] be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof." "Corroborating evidence may be slight, may be entirely circumstantial, and need not be sufficient to establish every element of the charged offense." (*People v. Hayes* (1999) 21 Cal.4th 1211, 1271.)

"An accomplice is . . . defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." (§ 1111.)  The trial court instructed the jury that Galloway was an accomplice to the crimes of attempted murder and assault with a firearm (in addition to the conspiracy offenses).

Galloway's identification of Smith as the person who fired the shots at Officer Jaramillo was sufficiently corroborated by other evidence tending to connect Smith with the shooting. Telephone calls between Maddox and Smith, played for the jury and summarized above, indicate that Smith drove from the Big House to the alley behind Granny's House shortly before the shooting. In a call at 9:12 p.m. on June 8, 2008, Maddox instructed Smith to drive into the alley behind Granny's House. In a call at 9:16 p.m., Smith informed Maddox he was in the alley. Maddox instructed him to park there, walk up to Granny's House and wait for him there.

Maddox arrived at Granny's House in the F150 pickup truck shortly before 9:30 p.m. In a call to his girlfriend Lee at 9:33 p.m., Maddox stated a car had followed him from the Vagabond Inn and was parked and waiting. After Officer Jaramillo's supervisor notified him that Maddox had observed him, Officer Jaramillo drove out into the street. At about the same time, officers heard Maddox say during an intercepted phone call, "That's it. That's it. Watch -- ay, ay, ay, ay." Then the call ended. A reasonable inference from the evidence is that Maddox was directing these statements at Smith as Smith followed Officer Jaramillo's car into the alley, and not at Lee who was on the phone. Cell phone tower records indicate Smith and Maddox were in the area around Granny's House at the time of the shooting.

A telephone conversation between Smith and Maddox that occurred after the shooting is further indication Smith was in the alley at the time of the shooting. In a call at 1:22 a.m. on June 9, 2008, Maddox asked Smith if he thought the person in the car had "wrecked" because "he was driving real fast." A reasonable inference from this evidence is that Maddox asked for Smith's opinion because Smith was there and had observed the car speeding out of the alley. Later in the call, Smith expressed concern that the person in the car was "a relation to" Maddox, and Maddox assured him that was not the case. A reasonable inference from this evidence is that Smith was concerned he had fired shots upon someone connected with Maddox.

Substantial evidence corroborates Galloway's testimony that Smith was the person who fired the shots at Officer Jaramillo. The calls between Smith and Maddox placing

Smith at the scene of the shooting are not dependent upon Galloway's interpretation. The cell phone tower records also independently place Smith at the scene of the shooting. As set forth above, "Corroborating evidence may be slight, may be entirely circumstantial, and need not be sufficient to establish every element of the charged offense." (*People v. Hayes*, *supra*, 21 Cal.4th at p. 1271.)

**Substantial Evidence Establishes Existence of Three Conspiracies**

Maddox contends there is insufficient evidence establishing the existence of three conspiracies. He argues the evidence established "only one conspiracy as a matter of law, that of a plan to assault rival gang members in the midst of a gang war and engage in the sale of narcotics, all of which, as testified to by the state's gang expert, [Officer] Nicholas Hartman, was consistent with benefitting the Hoover gang."

A conspiracy exists where two or more people agree to commit a crime, they specifically intend both to agree and to commit the crime, and one of them performs an overt act in furtherance of their agreement. (§§ 182, subd. (a)(1) & 184.) "[T]he essence of the crime of conspiracy is the agreement, and thus it is the number of the agreements (not the number of the victims or number of statutes violated) that determine the number of the conspiracies." (*People v. Meneses* (2008) 165 Cal.App.4th 1648, 1669.) "'Where two or more persons agree to commit a number of criminal acts, the test of whether a single conspiracy has been formed is whether the acts "were tied together as stages in the formation of a larger all-inclusive combination, all directed to achieving a single unlawful end or result."' [Citation.] 'Relevant factors to consider in determining this issue include whether the crimes involved the same motives, were to occur in the same time and place and by the same means,' and targeted a single or multiple victims. [Citation.]" (*Id*. at p. 1672.)

Substantial evidence establishes the existence of three conspiracies. Between June 7 and 8, 2008, defendants agreed to murder rival Denver Lane Blood gang members in retaliation for the murders of two Hoover gang members on June 6 and June 7, 2008. On June 17, 2008, defendants agreed to murder rival 65 Menlo Gangster Crip gang members

32

in an attack coordinated with an 8-Trey gang attack on another Crip set. Between May 10 and July 16, 2008, defendants agreed to transport and sell cocaine.

The three conspiracies occurred at different times. The overt acts supporting the conspiracies were different—there was no overlap. The murder conspiracies targeted different rival gangs. The motives for the murder conspiracies were different. The first involved retaliation for two specific murders that occurred within a day or two before the agreement to retaliate was formed. The second involved a coordinated attack on rival Crip gang members due to a general hatred of different Crip sets that border 8-Trey Gangster and 7-4 Hoover territories.

The fact that each of these conspiracies was committed for the benefit of and in association with the Hoover criminal street gang does not mean there was only one conspiracy as Maddox argues. Maddox cites Officer Hartman's expert testimony—given in support of his opinion that the charged offenses were committed for the benefit of and in association with the Hoover gang—that Hoover gang members generally reinvest the profits from drug sales in the gang by purchasing guns and ammunition and renting cars used in crimes. The evidence, however, does not establish the existence of one agreement to sell narcotics to fund the purchase of the guns and ammunition to be used in the planned murders of the rival Denver Lane Blood and 65 Menlo Gangster Crip gang members. In fact there is no evidence specifically linking the agreement to transport and sell cocaine between May 10 and July 16, 2008 with either of the two agreements to murder rival gang members. There is no evidence indicating that defendants or their associates planned to use or did use the profits from drug sales to rent cars or to purchase the particular guns or ammunition gathered for the June 8, 2008 planned attack on Denver Lane Blood gang members or the June 18, 2008 attack on the 65 Menlo Gangster Crip gang member.

Maddox also cites portions of the prosecutor's closing argument during which the prosecutor refers to an "overall conspiracy to shoot and kill rival gang members." The prosecutor's arguments are not evidence. What the evidence shows is not the formation of one agreement to kill any and all rival gang members, but the formation of two

33

separate agreements, one to kill Denver Lane Blood gang members and one to kill 65 Menlo Gangster Crip gang members.

**No Sua Sponte Duty to Instruct Jury to Decide if There Was a Single Conspiracy**

Defendants did not ask the trial court to task the jury with deciding the number of conspiracies. On appeal, however, Maddox contends the trial court erred in not instructing the jury sua sponte to decide whether there was a single or multiple conspiracies.

"California intermediate appellate courts are presently divided on whether the trial court has a duty to instruct the jury on single versus multiple conspiracies. [Citations.]" (*People v. Meneses*, *supra*, 165 Cal.App.4th at p. 1668.) Most decisions, including the most recent cases, have held the trial court has a duty to instruct the jury to decide whether there was a single or multiple conspiracies where there is evidence to support alternative findings. (See, e.g., *id*. at p. 1671; *People v. Jasso* (2006) 142 Cal.App.4th 1213, 1220.)

Maddox cites *People v. Vargas* (2001) 91 Cal.App.4th 506 in support of his argument there was only one conspiracy in this case. In *Vargas*, the prosecution charged the defendant, a member of the prison gang Nuestra Familia (NF), with one count of murder and one count of "conspiracy to commit murder, robbery, assault with a deadly weapon, arson, burglary, extortion, intimidation of witnesses, terrorist threats, escape, possession of concealable firearm by a convicted felon, and distribution of heroin, cocaine, phencyclidine (PCP), and methamphetamine." (*Id*. at pp. 517-518.) On appeal, the defendant contended the trial court erred in declining to instruct the jury to determine whether one or multiple conspiracies existed. (*Id*. at p. 549.) In concluding the trial court did not err, the Court of Appeal noted the court does not review "prosecutorial charging discretion" and the defendant could not have been prejudiced by being charged with one conspiracy count instead of multiple counts. (*Id*. at p. 553.)

The appellate court in *Vargas* also explained that "a single agreement to commit a number of crimes is only one conspiracy, regardless of the number of crimes sought to be committed, or that are committed, under that conspiracy." (*People v. Vargas*, *supra*, 91

Cal.App.4th at p. 555.) The court found that "the record evidence points only to one conspiracy—the agreement to establish the NF as a criminal gang to commit murder, robbery, burglary, extortion, and drug trafficking, among other crimes. Within that umbrella conspiracy were subconspiracies to commit specific crimes. However, the commission of the specific crimes, and the drawing up of plans required to commit them, were all in pursuance of the overriding purpose of the NF, which was to establish power through the use of crime, force, and fear, and to use that power to further strengthen and perpetuate itself by killing its enemies, raising money for the gang, and instilling obedience and discipline among its members by killing members who break its rules. Thus, Rosas was killed because he had 'snitched on Pablo Pena, Panther.' The decision to kill Rosas, being one in furtherance of the overriding purpose of the conspiracy, was part of the overall conspiracy, and hence cannot be the basis for filing a separate charge of conspiracy." (*Id.* at p. 553.)

Here, the prosecution charged defendants with three conspiracies, and the evidence shows three separate agreements, formed at different times, with different intended victims, and different overt acts committed in support of each agreement. The evidence does not show the formation of a single agreement to transport and sell narcotics and to kill any and all rival gang members.

**Section 654 Does Not Prohibit the Consecutive Terms Imposed**

Section 654, subdivision (a), provides in pertinent part, "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." "Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one." (*Neal v. State of California* (1960) 55 Cal.2d 11, 19.) "On the other hand, if the defendant entertained multiple criminal objectives that were independent and not incidental to each other, he or she 'may be punished for each

35

statutory violation committed in pursuit of each objective' even though the violations were otherwise part of an indivisible course of conduct." (*People v. Sok* (2010) 181 Cal.App.4th 88, 99.)  The purpose of section 654 is to ensure that punishment is commensurate with a defendant's culpability. (*People v. Meeks* (2004) 123 Cal.App.4th 695, 705.)

### Smith's contention

Smith contends section 654 prohibits multiple punishment for the conspiracy to commit murder between June 7 and 8, 2008, and the attempted murder of Officer Jaramillo, because "the conspiracy had no objective apart from the crime committed." We disagree.  The intent and objective of the conspiracy to commit murder was to kill rival Denver Lane Blood gang members in retaliation for the murder of two Hoover gang members.  The intent and objective of the attempted murder of Officer Jaramillo was to kill the person who was following Maddox.  Maddox did not know who was following him, but he wanted any threat eliminated.  The fact defendants attempted to murder Officer Jaramillo in the midst of their preparations to kill Denver Lane Blood gang members does not show they had the same intent and objective in committing both crimes.

### Maddox's contention

Maddox contends, pursuant to section 654, the trial court was required to stay the sentence for the conspiracy to commit murder on June 17, 2008 and the conspiracy to transport and sell cocaine because there was "one overall conspiracy" with the single "objective of assaulting rival gang members."  Again, we disagree.  As discussed above, the evidence does not establish one overall conspiracy.  Between June 7 and June 8, 2008, defendants agreed to murder rival Denver Lane Blood gang members in retaliation for the murders of Hoover gang members.  On June 17, 2008, defendants agreed to murder rival 65 Menlo Gangster Crip gang members in an attack coordinated with an 8-Trey gang attack on another Crip set.  Between May 10 and July 16, 2008, defendants agreed to transport and sell cocaine.  The evidence demonstrates defendants entertained multiple criminal objectives that were independent and not incidental to each other.

36

**Section 667, Subdivision (a)(1), Enhancements**

Smith contends the trial court erroneously imposed the prior serious felony enhancements under section 667, subdivision (a)(1), because the enhancements were not properly pleaded or proved. We agree.

The second amended information (and the prior version of the information) did not allege a prior serious felony enhancement under section 667, subdivision (a)(1). As discussed above, before sentencing, Smith and Maddox each admitted they suffered a prior strike conviction within the meaning of the Three Strikes law. They were not asked to admit a prior serious felony enhancement allegation under section 667, subdivision (a)(1).

Although Maddox admitted he suffered a prior robbery conviction, and Smith admitted he suffered a prior first degree burglary conviction, for purposes of the special allegation under the Three Strikes law, and these convictions also qualify as prior serious felonies under section 667, subdivision (a)(1), defendants should have been apprised of the consequences of their admissions before they made them—that an additional five-year term would be imposed on all counts except the counts for carrying a loaded firearm while being an active participant in a criminal street gang. (See *People v. Haskin* (1992) 4 Cal.App.4th 1434, 1440 ["a court cannot accept a guilty plea or admission from a defendant, and thereafter accept evidence or make findings that change the character of the crime or enhancement admitted so as to increase the authorized punishment therefor"].)

Defendants were not asked to admit a special allegation under section 667, subdivision (a)(1), and the trial court was not asked to make a finding under section 667, subdivision (a)(1). We will not encourage careless pleading and proof by allowing imposition of an enhancement which was not alleged, admitted or otherwise proven. The prior serious felony enhancements imposed on counts 1, 2, 3 and 15 are reversed and stricken.

37

**This Court's Independent Review of Wiretap Documents and Proceedings**

Maddox requests that this court independently review the public and sealed portions of the wiretap documents and proceedings and decide whether the trial court erred in denying his motion to unseal the wiretap affidavit and to quash and traverse the wiretap warrant. The Attorney General does not object to this court conducting the independent review.

As part of his request for our independent review, Maddox asked that we "order the superior court to transmit under seal to this Court, all relevant documents including the *in camera* hearings and wiretaps." He also asked that we "determine whether the record demonstrates that no critical information was lost."

We have reviewed all documents and transcripts included in the original appellate record related to Maddox's motions regarding the wiretaps, including the sealed transcripts from the April 8, 2010 and July 1, 2010 in camera hearings on Maddox's motion to unseal the wiretap affidavit and to quash and traverse the wiretap warrant, conducted before Judge Patricia M. Schnegg.

On January 15, 2014, we issued an order augmenting the record "to include all pre-trial applications for wiretaps, including the supporting affidavits and all other documents lodged with or received into evidence by the superior court regarding the wiretaps, including wiretap progress reports and supporting investigation reports, for all wiretaps authorized in this matter, including but not limited to" Wiretap 08-117 and Wiretap 08-117 Extension #1, Wiretap 08-113, Wiretap 08-75, Wiretap 08-123 and Wiretap 08-123 Extension #1, and Wiretap 07-195.

On January 31, 2014, we received from the superior court a box containing the items which appear to have been maintained in a sealed condition by LAPD: five sealed envelopes containing the original wiretap books and Blu-ray Discs for the wiretaps listed above. We also received the sealed copies of the wiretap affidavits the trial court received at the in camera hearing. Finally, we received two augmented volumes of clerk's transcript containing the public documents relating to the wiretaps (Maddox's motions and the prosecution's responses), all of which already were included in the

record on appeal except for the wiretap sealing orders. Having reviewed the public and sealed portions of the wiretap documents and proceedings, including the confidential portions of the affidavit, we are confident that "no critical information was lost"—a determination Maddox asked this court to make.

Maddox also asked this court to determine whether there was probable cause to issue the warrants and whether it was proper to seal portions of the affidavit.

All or part of a warrant affidavit may be sealed when disclosure will reveal or tend to reveal the identity of a confidential informant. (*People v. Hobbs* (1994) 7 Cal.4th 948, 971 (*Hobbs*) [search warrants]; *People v. Acevedo* (2012) 209 Cal.App.4th 1040, 1050-1051 [*Hobbs* procedures applicable to wiretap warrants].) Where a warrant affidavit has been sealed, the trial court should follow certain procedures "to strike a fair balance between the People's right to assert the informant's privilege and the defendant's discovery rights." (*Hobbs*, *supra*, 7 Cal.4th at p. 972.) If the defendant challenges the issuance of the warrant, the court should conduct an in camera hearing and "determine first whether there are sufficient grounds for maintaining the confidentiality of the informant's identity." (*People v. Galland* (2008) 45 Cal.4th 354, 364.) If there are, the court should then determine whether the sealing of the affidavit, or any part of it, is necessary to protect the informant's identity. (*Ibid.*; *Hobbs*, *supra*, 7 Cal.4th at p. 972.)

If the trial court concludes the affidavit was properly sealed and the defendant has moved to quash the warrant, "the court should proceed to determine whether, under the 'totality of the circumstances' presented in the . . . warrant affidavit" there was probable cause for issuance of the warrant. (*Hobbs*, *supra*, 7 Cal.4th at p. 975.) "A wiretap may be ordered based upon affidavits" furnishing "probable cause to believe that an individual is committing one of a number of specified crimes (among them the drug-trafficking [and conspiracy to commit murder] crimes charged in this case), and that communications concerning the crimes will be obtained by the wiretaps." (*People v. Acevedo*, *supra*, 209 Cal.App.4th at p. 1051, citing § 629.52.) The court may disturb the warrant "'only if the affidavit fails as a matter of law . . . to set forth sufficient competent evidence supportive of the magistrates finding of probable cause.'" (*Hobbs*, *supra*, 7 Cal.4th at p. 975,

39

citation omitted.) "If the court determines . . . that the affidavit and related materials furnished probable cause for issuance of the warrant . . . the court should simply report this conclusion to the defendant and enter an order denying the motion to quash." (*Ibid*., citation omitted.) Whether the magistrate had a substantial basis for concluding there was probable cause is a question of law and therefore subject to independent review. (*People v. Camarella* (1991) 54 Cal.3d 592, 601.)

Based on our independent review, we find the trial court properly sealed portions of the warrant affidavit to protect an informant's identity, and there was probable cause to issue the warrants (both wiretap and search warrants).[12]

## DISPOSITION

The prior serious felony enhancements under Penal Code section 667, subdivision (a)(1), imposed on counts 1, 2, 3 and 15, are reversed and stricken as to both defendants. In all other respects, the judgments are affirmed. The clerk of the superior court is directed to prepare an amended abstract of judgment for each defendant and to forward it to the Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHED.


CHANEY, J.

We concur:


ROTHSCHILD, Acting P. J.


JOHNSON, J.

[12] On appeal Maddox does not challenge the denial of his motion to traverse the warrant. We note that our independent review of the warrant affidavit, including the sealed portions, did not cause us to suspect that any material misrepresentations or omissions were made. (See *Hobbs*, *supra*, 7 Cal.4th at p. 974.)